IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

| | |
|---|---|
| J.T. SHANNON LUMBER COMPANY, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No. 07-2847-Ml/P |
| | ) |
| RICHARD BARRETT, | ) |
| | ) |
| Defendant. | ) |

_____

_____

### REPORT AND RECOMMENDATION

_____

Before the court by order of reference is plaintiff J.T. Shannon Lumber Company, Inc.'s ("Shannon Lumber") Motion for Rule 11 Sanctions and Sanctions Under 28 U.S.C. § 1927 ("Motion for Sanctions"), filed on behalf of Shannon Lumber by its counsel, attorneys with the Memphis law firm of Glankler Brown, PLLC. (D.E. 261.) Shannon Lumber alleges that defendant Richard Barrett gave false testimony at his deposition about a critical piece of evidence – an email dated February 9, 2006 with a six-page attachment, referred to throughout this litigation as the "China Gilco Document" – and that after his deposition Barrett continued his pattern of deceit by filing a false affidavit in support of his Motion for Summary Judgment and committing perjury during his testimony at trial regarding this document.

Shannon Lumber claims that Barrett's counsel, attorneys with

the Memphis law firm of Kiesewetter Wise Kaplan Prather, PLC ("Kiesewetter firm"), should be sanctioned because the firm (1) was on notice after Barrett's deposition that he had lied about the China Gilco Document and therefore all papers filed by the Kiesewetter firm after his deposition, including the Motion for Summary Judgment and supporting affidavit, were presented for an improper purpose and without evidentiary support; (2) refused to amend Barrett's answer, in which Barrett maintained that he did not breach his Employment Agreement; and (3) continued to pursue a frivolous defense and counterclaim based on alleged illegal activities by Shannon Lumber. Shannon Lumber further contends that Barrett spoliated evidence contained on two laptop computers, and that Barrett and the Kiesewetter firm needlessly increased Shannon Lumber's litigation expenses by propounding voluminous and irrelevant discovery requests and improperly serving a subpoena and deposition notice on a non-party witness during a deposition. In its motion, Shannon Lumber requests that the court (1) strike Barrett's Motion for Summary Judgment; (2) strike Barrett's answer, counterclaim, and affirmative defenses and other pleadings; (3) strike Barrett's Motion to Disregard Proof; (4) award attorneys' fees and expenses to Shannon Lumber for time spent preparing its Motion for Summary Judgment, responding to Barrett's Motion for Summary Judgment, responding to Barrett's Motion to Disregard Proof, and taking Scott England's deposition; and (5) impose other

-2-

sanctions as the court deems appropriate.

Barrett and the Kiesewetter firm filed a joint response in opposition to the Motion for Sanctions on July 29, 2010.[1]  On August 2, 2010, Chief Judge Jon Phipps McCalla denied Shannon Lumber's motion to the extent the motion asked the court to strike Barrett's pleadings and other papers.  In so ruling, Chief Judge McCalla explained that a sanctions award of striking Barrett's pleadings was not appropriate because "Defendant has not admitted to committing perjury; to the contrary, Defendant continues to maintain that his testimony is truthful in all respects."  (D.E. 388 at 2.)  He further stated that "at this time, rather than the Court make a perjury or spoliation determination on the basis of a paper record, the prudent course of action is to permit the case to proceed to trial and allow the jury to assess the credibility of Defendant's testimony."  (Id. at 2-3.)  However, as to Shannon Lumber's request for attorneys' fees under Rule 11 and 28 U.S.C. § 1927, Chief Judge McCalla referred that part of the motion to the magistrate judge for a report and recommendation.  At a hearing before the undersigned magistrate judge held on August 3, 2010, the parties agreed that Shannon Lumber's motion should be held in abeyance until after the completion of the trial.

---

[1]Because the allegations have been made against both Barrett and his attorneys, the Kiesewetter firm has hired separate counsel to represent the firm in responding to the motion.  The Kiesewetter firm continues to represent Barrett in defending against the motion.

The jury trial began on August 16 and concluded on August 26, 2010.  On September 28, 2010, Shannon Lumber filed a "Supplemental Memorandum" in support of its Motion for Sanctions.  On October 6, 2010, Barrett and the Kiesewetter firm filed a Motion to Strike Portions of Shannon Lumber's Supplemental Memorandum.  On October 8, the parties appeared before the magistrate judge for a post-trial hearing on the motion.  After the hearing, and pursuant to the court's instructions, Barrett and the Kiesewetter firm filed portions of the transcripts from Barrett's trial testimony and from a telephonic hearing held on December 31, 2009 before Chief Judge McCalla on non-party Frank C. Owens's Motion to Quash Subpoena and Deposition Notice and for Protective Order.  Subsequently, Shannon Lumber filed cross-designations of the transcripts of Barrett's trial testimony and the December 31 hearing.  Shannon Lumber also filed its Amended Proposed Jury Verdict Form containing Proposed Questions Nos. 13 and 14.

Based on the entire record, the court submits the following proposed findings of fact and conclusions of law, and recommends that the Motion for Sanctions be denied.

## I.   PROPOSED FINDINGS OF FACT

**A.   Background**

Shannon Lumber is in the business of selling hardwood lumber

products.[2]   In June of 2001, Shannon Lumber hired Barrett as it Territory Manager of the Midwest Region.  As part of his employment with Shannon Lumber, Barrett entered into a "Confidentiality Agreement" on June 19, 2001, followed by a separate "Employment Agreement" on July 27, 2001.  The Employment Agreement contained three provisions relevant to this case: a "Confidentiality" provision, a "Non-Competition" provision, and a "Non-Solicitation" provision.  Barrett held the position of Territory Manager of the Midwest Region until he was promoted to Vice President of Sales on January 1, 2002.

In late 2002, Barrett and Jack Shannon ("Mr. Shannon"), owner and Chief Executive Officer of Shannon Lumber, made the decision to expand Shannon Lumber's business operations into the Asian lumber market.  As part of the expansion, Shannon Lumber opened an office in Shanghai, China and hired Jianling "Gary" Xu, a Chinese national, who had experience trading North American timber to Chinese companies.  Xu was hired to "start[] [Shannon Lumber's] Asian business from scratch" and reported directly to Barrett. Like Barrett, Xu entered into an employment agreement with Shannon Lumber that contained confidentiality and non-competition provisions.

---

[2]These background facts are taken from the court's August 4, 2010 Order Denying Plaintiff's Motion for Summary Judgment and Granting in Part and Denying in Part Defendant's Motion for Summary Judgment.  (D.E. 294.)

According to Shannon Lumber, business out of the Shanghai office was so successful that its supply could not meet demand. Barrett contacted Scott England of Gilco Lumber, Inc. ("Gilco"), a company that was also in the business of marketing and selling hardwood lumber. As a result of the discussions between Barrett and England, Shannon Lumber and Gilco entered into an arrangement whereby Shannon Lumber would purchase lumber from Gilco, take title to it, and resell the lumber to Shannon Lumber's customers in the Asian markets. In 2005, Barrett and England discussed the possibility of Shannon Lumber and Gilco forming a joint venture which would expand each company's presence in the Asian lumber market. As part of these discussions, England traveled to China and toured the Samson/Lacquercraft furniture manufacturing plant, Shannon Lumber's largest Chinese customer, with Barrett and Xu. James "Buck" Harless, Chairman of Gilco, also traveled to China and toured the same plant with Xu. According to Barrett, he attended a meeting in West Virginia with England and Harless to continue discussions regarding the joint venture. Despite these discussions, Mr. Shannon informed Gilco in late 2005 that Shannon Lumber was unwilling to go forward with the joint venture. Shortly thereafter, Barrett resigned as Shannon Lumber's Vice President of Sales.[3] After Barrett's resignation, Gilco began selling directly

_____

[3]Barrett's resignation letter provided, in relevant part, "[e]ffective February 10th I hereby tender my resignation as Vice President of Sales from J.T. Shannon Lumber Company." Barrett,

to Samson/Lacquercraft.  England also attempted to hire Xu to work for Gilco.  Xu declined Gilco's offer of employment but recommended his wife, Claire Chen.  In March of 2006, Gilco hired Chen to be Gilco's Asian sales representative.

During a routine visit to Shannon Lumber's office in Shanghai, Frank Owens, Barrett's successor at the company, discovered Gilco documents on a Shannon Lumber computer.  Xu attempted to prevent Owens from examining the information.  Xu later admitted that he deleted several files, including Gilco's customer order information, from the Shannon Lumber computer.  The deleted files were reconstructed by Shannon Lumber and formed the basis of Shannon Lumber's lawsuit against Barrett, Gilco, Xu, and Chen filed in the United States District Court for the Northern District of Mississippi ("Mississippi litigation") on July 13, 2007.  On December 14, 2007, Shannon Lumber's claims against Barrett were severed and transferred to this court pursuant to a forum selection clause in Barrett's Employment Agreement.

On May 1, 2008, Shannon Lumber filed an amended complaint alleging the following causes of action against Barrett: (1) misappropriation of trade secrets in violation of the Tennessee Uniform Trade Secrets Act ("TUTSA"); (2) breach of contract; (3) breach of fiduciary duty of loyalty; (4) conversion; (5) tortious

---

however, maintained that his employment with Shannon Lumber terminated February 7, 2006.

interference with contract; (6) civil conspiracy; (7) unfair competition; (8) disparagement; and (9) fraud.  (D.E. 27.)

On August 27, 2008, Barrett filed his Answer to First Amended Complaint and Counterclaim.  (D.E. 72.)  Among other things, Barrett alleged in his sixth affirmative defense that during the course of his employment at Shannon Lumber, he discovered that Shannon Lumber engaged in a number of illegal activities that constituted a substantial factor in his decision to resign, including falsely booking sales to enhance its credit image with lenders, discharging wastewater into a public creek, and employing illegal aliens.  (Id. at 11.)  Barrett also brought a counterclaim of unclean hands against Shannon Lumber based on the same alleged illegal activities.  (Id. at 20-21.)

**B.   Shannon Lumber's Discovery of the China Gilco Document**

On November 5, 2009, Gilco produced an external hard drive to Shannon Lumber as part of discovery in the Mississippi litigation. According to Shannon Lumber, Gilco's hard drive contained 42,356 electronic files and emails from multiple Gilco employees.  From November 5 through November 12, 2009, Shannon Lumber conducted a review of the files and emails.  On the evening of November 11, Shannon Lumber discovered the China Gilco Document on the hard drive, a document which had not been previously produced by Barrett during discovery.  The document consisted of an email sent from Barrett to England on February 9, 2006, along with a six-page

-8-

attachment, and was sent from an email account (richard.barrett@hardwoodreport.com) that Barrett had not disclosed to Shannon Lumber during discovery. The document contained numerous statements that, according to Shannon Lumber, evidenced Barrett's intent to assist Gilco in opening an office in China and to assist Gilco in entering the Asian market as a direct seller of lumber in competition with Shannon Lumber. For example, Barrett wrote:

- What opportunities does this create for GILCO Lumber?

- This could be a good market for GILCO but the company would have to transition the length mix all the way back to the woods, loggers would have to cut more 8' logs.

- This segment represents a solid opportunity for GILCO Lumber in Red Oak due to good colored product, a proximity to the port of Norfolk, and the ability to be a large volume supplier.

- Changing manufacturing methods (turn for optimum grade vs. sawing for fixed widths) will occur gradually over the next few years but the Chestnut White Oak logs GILCO Lumber cuts volumes of yields the character marked White Oak lumber Chinese manufacturers are buying to make rustic floors for the European and US markets.

- Furniture Manufacturers – This is a huge market segment for North American hardwoods and one where GILCO Lumber can do very well in China.

- Poplar is the king of species for furniture manufacturing and GILCO's Poplar, heavy white, large volumes, works well for Chinese manufacturers.

- In summary GILCO Lumber has four market segments and three key products that fit with each.

- **Steps in Setting Up Chinese Sales Offices for GILCO Lumber Co.**

- For a company like GILCO Lumber Co. China and the rest of Asia the market is best viewed as simply where furniture is now manufactured instead of North Carolina and Virginia.

(Trial Exhibit 15) (emphasis in original.)

## C.   Barrett's Deposition

On the following day, November 12, 2009, Shannon Lumber's attorney, Oscar C. Carr, III, took Barrett's deposition as part of the Mississippi litigation.   Carr initially questioned Barrett about whether he ever provided Gilco with information to assist Gilco in entering the Asian lumber market, and after Barrett denied ever doing so, Carr confronted Barrett with the China Gilco Document:

> Q.   Do you deny that you provided Gilco with information in terms of a business plan about how it should enter the Chinese market?
>
> A.   I certainly do deny that.
>
> Q.   You sure about that, too?
>
> A.   Um-hum.
>
> Q.   Yes?
>
> A.   Yes, sir.
>
> Q.   You never wrote any business plan for Gilco to enter the Chinese market where you made recommendations of how Gilco could successfully do that?
>
> A.   No, sir.

Q.   At any time?

A.   No, sir.

Q.   Including while you worked for Shannon?

A.   No, sir.

Q.   Do you recognize that if you had done that while you were working for Shannon, that would have been in breach of your employment agreement and the separate confidentiality agreement we have already looked at?

A.   Yes, sir.

. . . .

Q.   If you look at the second page of Exhibit 234 [China Gilco Document], it's an e-mail message from you, from your e-mail address, Rick Dot Barrett at Hardwood Report Dot Com, dated February 9, 2006 to Scott England, subject, look at this, attachment China Gilco Dot Doc.  Is that your e-mail?

A.   It is my e-mail address, but I don't ever remember looking at this document.  It looks like somebody did a whole lot of work for them analyzing the market.

Q.   You deny that you did this work?

A.   No, I didn't do that work.

Q.   Do you deny that you wrote the e-mail to Scott England with this – sending this attachment, China Gilco?

• . . .

A.   I don't remember having done this.  I really don't. This is a lot of work.

Q.   You want to take the time to read the attached document.

A.   Looks like Scott asked me to prepare kind of an analysis of what it took to do in China.  I don't

-11-

> remember doing it, but I could have.  Appears that
> – analysis that I wrote of what it would take to be
> successful in China.

(Barrett Dep. at 164-65, 238-39.)

Carr also questioned Barrett about his two laptop computers that were no longer available because, according to Barrett, one computer had been given away to a young child and the other had been accidentally damaged by his wife:

> Q.   You did all the work on your personal computer;
>      correct?
>
> A.   Correct.
>
> Q.   What happened to your personal computer?
>
> A.   I gave it to the kid of one of the guys that helped
>      me rebuild my front porch before I moved because it
>      was five years old, and I wasn't using it anymore,
>      and I hadn't turned it on in months.
>
> Q.   When was that?
>
> A.   It would have been in June or so of '06.
>
> .  .  .  .
>
> Q.   Who is the child to whom you gave your computer?
>      What's his name?
>
> A.   I don't know.  It was one of the kids of one of the
>      helpers to a guy that used to help me around the
>      house, rebuilding the porch, rebuilding the gazebo,
>      doing all of the maintenance that we had to do on
>      the house in order to sell it.
>
>      .  .  .  .
>
> Q.   Do you remember the name of his father that helped
>      you?
>
> A.   Honestly I don't.  I really don't.

. . . .

Q.    What else would you have had?

A.    One of the things I knew I had on there was my
      resume, and I ended up having to recreate that, but
      beyond that, it was just correspondence, anything
      that I didn't copy off of the – onto the server
      there was erased.  That's why none of it – we
      didn't have any of it.

      At the tail end of when I was working there, I also
      bought a Mac laptop that I used occasionally
      because I was working – personally that I worked on
      with my publishing thing.

      My wife dropped that, broke the screen in
      September/October of '06, took it to the Apple
      store.  It was a $750 repair for a $500 computer.
      We threw it in the trash, and off it went.

Q.    What data was on the Mac?

A.    My – that – it was used primarily for that North
      American Hardwood Report.

Q.    And was that where you saved the Mac Dot Com e-
      mails?  Was it on that computer?

A.    I didn't save any e-mails from any of those
      accounts.  Mac Dot Com is a service just like
      Yahoo, just like Hotmail.  So whatever is there is
      there.

(<u>Id.</u> at 301-04.)

**D.   Barrett's Affidavit**

On March 12, 2010, Barrett filed a Motion for Summary
Judgment.  In support of his motion, Barrett filed a twenty-three
page affidavit.  Among other things, Barrett claimed in his
affidavit that he sent the China Gilco Document to England because
he wanted England and Harless to support a newsletter that he was

-13-

trying to start, that the document was going to be the "kickoff article" for that newsletter, and that the reason he had not disclosed the email account he used to send the document was because he allowed the account to expire in 2006 and forgot that he had the account:

> 38. In sending [the China Gilco Document], I was not trying to get Gilco Lumber to stop supplying Shannon Lumber International, Inc. or J.T. Shannon Lumber Company, Inc. I also was not trying to get any of the customers of Shannon Lumber International, Inc. to buy from Gilco Lumber or to stop doing business with Shannon Lumber International, Inc. Instead, by sending [the China Gilco Document] to Scott England, I was hoping that Mr. England and Buck Harless might have an interest in supporting my newsletter that I was trying to start. I had reviewed the same newsletter idea with Mr. Shannon. While Mr. Shannon did not indicate he would provide any capital to start the newsletter, Mr. Shannon also received the entire business plan and did not indicate to me he had any problem with what I was doing. The business plan specifically references market analysis as part of the newsletter. A copy of my newsletter business plan I provided to Mr. Shannon is attached as Exhibit L. This email was planned to be the kickoff article in the Hardwood Report newsletter if I had followed through with starting the newsletter company.

> 39. In my career prior to coming to work for J.T. Shannon Lumber Company, Inc. from approximately 1985 to 2000, I was an editor of a newsletter on the hardwood lumber market named the *Weekly Hardwood Review*. This newsletter covered the U.S. hardwood lumber market and global hardwood lumber markets. I also was an editor of the expert version of the hardwood newsletter named *Hardwood Review Export* (later called the *Hardwood Review Global*). . . . In my work as an editor of the *Weekly Hardwood Review* and *Hardwood Review Export*, I regularly engaged in the same type of analysis as reflected in my email of February 9, 2006 regarding

-14-

the hardwood lumber markets. . . .

50.  I did not remember the email address
     [rick.barrett@hardwoodreport.com] at the time I
     assisted counsel in completing my interrogatory
     responses.  I let this email address lapse in 2006
     when I decided I could not pursue my newsletter
     idea and I determined to find a job with a lumber
     company.  The existence of the email address has
     since been learned by Shannon Lumber in the
     discovery process.  After the production of the
     [China Gilco Document] in this case, I attempted to
     obtain any contents of the email account
     corresponding to the address of
     [rick.barrett@hardwoodreport.com].  I was advised
     that the account had lapsed and that no email
     existed.  The lawsuit against me was not filed
     until July 13, 2007 and I had no notice of any
     claim before I learned of the lawsuit.

(D.E. 213, Barrett Aff. ¶ 38-39, 50.[4]

On April 9, 2010, England was deposed and specifically

questioned about paragraph 38 of Barrett's affidavit:

Q.  I want to go down to the next paragraph in the
    Barrett affidavit, Paragraph 38, to the second
    sentence.  It's the last line on page 17.  It says,
    "Instead, by sending Exhibit K to Scott England, I
    was hoping that Mr. England and Buck Harless might
    have an interest in supporting my newsletter that I
    was trying to start."  Did Mr. Barrett talk to you
    and say, Hey, Scott, I'm sending you this article,
    excuse me, this –

A.  Exhibit B?

Q.  – Exhibit B because I want you to invest in my
    newsletter and I think this would be good?

A.  No.  Did he say that?  No.

---

[4]The newsletter business plan referenced in paragraph 38 of
Barrett's affidavit is a 76-page document attached as Exhibit L to
the affidavit.  (D.E. 201-3.)

-15-

    Q.   Has he ever told you that, that that's why he sent
         it to you?

    A.   No, sir.   I testified earlier that he kind of
         hinted around but never came out and asked for
         investing, an investment in his newsletter.

(Mot. for Sanctions, D.E. 262-7, Ex. G).[5]

       On August 4, 2010, the court denied Shannon Lumber's Motion
for Summary Judgment in its entirety and granted in part and denied
in part Barrett's Motion for Summary Judgment.  The court allowed
the following claims to proceed to trial: (1) trade secret
misappropriation under the TUTSA; (2) breach of Barrett's
Employment Agreement; (3) breach of fiduciary duty, to the extent
that the claim was not premised on the disclosure of the China-
Gilco Document, because that claim was preempted by the TUTSA; (4)
tortious interference with contract, to the extent Barrett
allegedly induced Xu to breach the Non-Competition provision in his
Employment Agreement; and (5) unfair competition, to the extent
that Shannon Lumber could prove that it lost customers or business
prospects as a result of interference with the Non-Competition

---

[5]England's testimony provided some corroboration for Barrett's
contention that he sent the China Gilco Document to England with
the hope that he could get England's financial support for the
newsletter.   The court notes that in the Motion for Sanctions,
Shannon Lumber misleadingly quoted England's response "No, sir,"
without quoting his testimony that Barrett "hinted around" about
investing in his newsletter.  Even if Shannon Lumber believed that
the latter part of England's response was not relevant, Shannon
Lumber (and more specifically its attorney) at minimum should have
indicated that testimony was omitted from the quote (such as by
using ellipsis) so as not to mislead the court.

                                -16-

provision of Xu's employment agreement.   (D.E. 294 at 37-38.)

**E.   Barrett's Credibility at Trial**

At trial, Carr questioned Barrett extensively about the China Gilco Document and his laptop computers.  As evidenced by Barrett's trial testimony quoted at length below, Carr vigorously attacked Barrett's credibility in front of the jury, including highlighting Barrett's failure to produce the China Gilco Document during discovery, challenging Barrett's explanation for why his laptop computers were no longer available, and pointing out the inconsistencies in Barrett's deposition testimony, affidavit, and trial testimony regarding why he created the China Gilco Document and why he sent it to England:

> Q.   Now, you said everything was going well up until the time you left Shannon as far as the relationship between Shannon and Gilco, as far as you knew?
>
> A.   Yes, sir.
>
> . . . .
>
> Q.   If you would turn to the second page of Exhibit 15 [China Gilco Document].
>
> A.   Yes, sir, I'm there.
>
> Q.   It's your e-mail to Scott England, February 9th. Now, that's the day before – I know you say there's a different day, but that's the day before your resignation letter says was the last day of your employment?
>
> A.   It's the day before the letter, yes.
>
> . . . .

Q.    If everything was going so great right before you
      left, then don't you think it is a little odd that
      you sent this letter telling Gilco how it should
      get into China and how it should open, giving it
      advice on opening an office?

A.    I think what we need to do is put the letter in
      context as to what it was and why it was sent, to
      answer that question.

Q.    You did send this, right?

A.    Yes, sir, I did.

Q.    And you sent this not to hurt Gilco, you agree with
      that?

A.    I sent it to help myself.

Q.    You sent it to help Gilco too, didn't you?

A.    Well, no, sir, I sent it to try and persuade Gilco
      to help me fund my newsletter.

Q.    Didn't you send - well, let's turn the page.
      Didn't you send the six-page document to Gilco, not
      to help yourself, but because Scott England had
      requested it, and he had asked for a market
      analysis for China, and so you did it and you sent
      it to him to help Gilco?

A.    Mr. Carr, when we were in my Mississippi
      deposition, you pulled out this document, and I had
      not seen it.  I answered I truly don't remember
      this document, and my testimony will reflect that.
      And you continued to ask questions about it, and I
      started guessing as to what it might be.  But if
      you will read my testimony, you know that I
      continued to question, because I didn't remember
      where it had come from.  And if you read the whole
      testimony, you will see that, yes, sir, I did say -
      I said it looks like somebody did a lot of work it
      looks like Scott asked me to do this, but the
      beginning of my testimony clearly states that I
      didn't remember this document.

Q.    You wrote the document, didn't you?

-18-

A.   Yes, sir.  This was presented to me, what – '06,
     '09, three years later.  We hadn't produced the
     document.  I had not seen it, because the document
     was on a laptop that was destroyed when my wife was
     down here doing flight attendant training in
     Memphis, she works for Pentacle Airlines.  So when
     the laptop was not repairable, I lost all of the
     Hardwood Report documentation, it all went away
     when Apple told me it cost too much to fix the
     laptop.  That's exactly what we talked about before
     in the deposition.

Q.   So if I hadn't found the document, you would have
     no recall of this, right?

A.   I really wouldn't.  I had – honestly, I had given
     up on a dream that I had of owning my own business.
     I couldn't get the funding to do my newsletter
     plan, and I had moved to Minnesota partially
     because I had a job up there that I wanted, but
     mostly because I had a daughter that needed some
     healthcare resources that were up there, so things
     were going good and I had just put this behind me.

Q.   Let's look at pages 239 and 240 in your deposition
     about what you said back on November the 12 of 2009
     about the China Gilco document.  It actually starts
     on page 238. . . . [Carr reads deposition questions
     and answers relating to China Gilco Document]. . .
     .
     So that was your testimony?

A.   Yes, sir, it was.

Q.   And having now had the time period elapsed between
     November 12th and today, which is August the 19th,
     2010, you did write that document, the China Gilco
     document?

A.   Yes, sir.

Q.   And you did send it to Scott England?

A.   Yes, sir.  But I also put a lot of thought into
     trying to remember when I wrote that document and
     what it was for too.

Q.   Well, there's not any question, though, about when

you sent it to Scott England, is there?  The e-mail shows that you sent it on February the 9th, 2006?

A.  No, sir, no question at all.

Q.  And there's no question that Mr. England got it at least by the next day because we have on the other end – up at Gilco, we have the Darrell Sheets/Gary White end of your e-mail with the attachment is forwarded on to Mr. White, the CEO of International Industries, right?

A.  Yes, I have seen this produced several times in this case.

. . . .

Q.  I want to ask you, Mr. Barrett, when you were – how long did it take you – you said in your deposition that that document took a whole lot of work.  How long did you work on that document for Gilco before you sent it to Scott England?

A.  I had a lot of the document – as I recall, I had a lot of the document written.  Understand, Mr. Carr, and if we went back and looked at the business plan for the North American Hardwood Report, it was going to be a translated electronically delivered market analysis pricing and advertising publication for the hardwood industry, and I was working with database vendors and web vendors trying to figure out how to pull this technology package together, and so I was also, while I was trying to find funding, thinking about what my initial topics were going to be that I was going to cover.

And I think it's pretty obvious, and it came to me the more I thought about this, is that the first part of it was the same as the market analysis sections that I kind of did when I was at the Hardwood Review.  In fact, I did them a lot, and that second section is bullet points towards the next article that I was going to make, and there's a lot of comments to myself in there that are in parenthesis.

. . . .

-20-

Q.   Yes, sir.  So you don't know how long it took you
     to write this document?

A.   No, sir, I don't.

Q.   When did Mr. England contact you – when in point in
     time did he contact you and ask you to start
     working on this market report for him for China?

A.   As I indicated in my deposition, I was guessing, he
     never called me and asked me to do this.  I sent
     it.

Q.   So you take that back?

A.   Yes, sir, I do.  I think it is pretty clear that
     when the document was given to me, I didn't
     remember it, I said I didn't remember it.  I was
     guessing, and that was wrong.

Q.   I think when we started talking about this
     document, you told me that this document was – I
     think I asked you if you were helping Gilco, and
     you said something like, no, it was to help you; am
     I misremembering?

A.   I don't recall that.

Q.   Okay.  Let me just ask a direct question.  Isn't it
     true that Exhibit 15, the Gilco – China Gilco
     document, you prepared and sent to Gilco
     specifically to help Gilco know how to open an
     office in China and to help it do that?

A.   No, sir, that is not correct.

Q.   Isn't it true that when you did that, you were
     acting as Gilco's friend and offering it advice and
     how to do exactly what you say in that paper?

A.   This is general newsletter information that I was
     trying to get an audience with Mr. Buck Harless to
     finance my newsletter.  I had just come home from
     the surfaces trade show in Las Vegas.  I had flown
     home two days early to put my daughter in the
     hospital.  It was one of those moments of I
     resigned my job, I got a family to take care of, I

                          -21-

need to get this thing funded, and so that's why I
sent it.

Q.   I'm going to refer to page 257 of his deposition,
line 17 through 24.  The question was:

You were acting as a consultant to Gilco when you
provided the China Gilco document to Scott England,
weren't you?

Answer: I wouldn't call it a consultant.  I would
call it I was just a friend offering advice.

A.   Again, I didn't remember having sent it, and I was
guessing, and that was incorrect.

Q.   Well, whether you were guessing or not, isn't that
true, that you were a friend of Scott England's and
you were offering advice to Gilco on exactly what
this document says how to open an office in China,
and giving them a road map of how to do that based
on exactly what you had learned at Shannon through
the efforts that you were paid to do and did for
Shannon in opening that office?

A.   No, sir.  This – you guys called it a playbook, you
have called it a business plan, now it's a road
map.  That's not what it is.

.  .  .  .

Q.   Exactly my point.  So it was specific – this
document was specifically done by you for Gilco
down to how they do their trade name, capitalized?

A.   In an attempt to get an audience and get my
newsletter funded.

Q.   Mr. Barrett, in your deposition back in November of
'09, you will agree with me that you never offered
the explanation that the China Gilco document was,
in fact, an article for a newsletter?

A.   No, sir, I gave testimony, and then it really
bugged me as to where this came from.  But that was
the deposition in the Mississippi case, and I had a
date to do the deposition in the Tennessee case
around the end of January, so, yes, sometime around

-22-

there, I sat down, I thought about it, I had some time, I started dissecting the document and I figured out what I had used it for.

Q.     You're not telling us that your testimony would be different in Mississippi than it would be in Tennessee, are you?

A.     What I'm telling you is that by the time we would have done that, that's why I had Mr. Simmons correct my testimony in my affidavit.

. . . .

Q.     Okay.  Just so we're clear, the deposition, your deposition and your testimony on that day, which ran 324 pages, you never offered the explanation that this document, the Gilco – China Gilco document was a newsletter article, did you?

       . . . .

A.     No sir, that was the first time that I had seen it in the case when you gave it to me.  I didn't remember it, I said I didn't remember it, and then I started trying to guess where it came from.

. . . .

Q.     I had asked you earlier, and it's not that big a point, but you're free to count, if you want to, don't take my word for it, but I had counted Gilco Lumber in the document ten times, but whether it is eight or ten or in that range, this is the point of my question, are you telling me that despite the fact that Gilco Lumber is in here a number of times and despite that fact that we have something as specific as on page two the heading, steps in setting up Chinese sales offices for Gilco Lumber Company, that your position now is that this was to be a newsletter article of general interest in the timber and lumber industry about China?

A.     It was going to be two newsletter articles.  The first half was going to be one week, and those were my – that was more finished, and then the second half was going to be setting up Chinese sales offices, and these were the bullet points on where

-23-

I was headed towards the second article.

. . . .

Q.    Mr. Barrett, I want to go back to the last line of
      paragraph 38 on page 18 of your affidavit which
      relates to the newsletter statement.

      It says: Quote, this e-mail was planned to be the
      kickoff article in the Hardwood Report Newsletter
      if I had followed through with the starting – with
      starting the newsletter company.

      Did I read that correctly?

A.    Yes, sir.

. . . .

Q.    And that's the statement – a statement that is
      contained in your affidavit.  Now, that statement
      is not contained in your deposition testimony, we
      can agree on that?

A.    Yes, sir.

Q.    In addition, that statement does not talk about two
      articles, it talks about one article, the kickoff
      article, correct?

A.    Yes, sir.

Q.    So sometime between March 11, 2010 and today, you
      have decided that the China Gilco document was
      actually to be two articles in the newsletter
      rather than one, true?

A.    Mr. Carr, what I was referring to, that first
      portion of the – of the 2-9-06 document is a nearly
      completed article.  The second portion, would I
      have used portions of that as I completed it?
      Quite possibly.  The second half of this thing is
      just bullet points, it's just thoughts.  We're
      going to get hung up on singular and plural here,
      this is the intended use of this information,
      that's why I wrote it.

. . . .

-24-

Q.   All right.  Now, we can agree, though, can't we,
     that the China Gilco article – I mean plan there
     was not an article, either one article or two
     articles, it was never a printed article of any
     type in any newsletter or magazine?

A.   I am confident because this is how I remember it
     that I had put it into the database and practiced
     translating it when I was working on my newsletter
     plan, but, no, it wasn't going to be a printed – a
     printed out document.  It was going to be an
     electronically delivered newsletter.  So it was
     used to practice with.

Q.   So it was a practice article?

A.   The premise of the North American Hardwood Report
     was – and it wasn't just China, it was Korea, it
     was Japan, it was Vietnam, it was India, it was all
     over the world, and Google makes software that you
     can put in an English document and then you can
     tell it to translate it into other languages, and I
     had a file maker database that held an English
     version and a Spanish version, a German version, an
     Italian version, a Chinese version, the whole bit,
     and that was how it was going to be used, and this
     was in that database.

Q.   Well, you have never produced that database to us
     in the lawsuit, have you?

A.   No, sir, it's on the computer that I don't own.  It
     was thrown away in June of 2006 before this lawsuit
     was ever filed, or 2007, whenever my wife got back
     to Minneapolis from Memphis from her flight
     attendant training.

Q.   Was that the – was that the Apple Power Book?

A.   Yes, sir, it was.

Q.   Well, the lawsuit was filed in 2007.

A.   We would have to look at her badge.  Whenever she
     went to work for Pentacle, she is here, we can look
     at it.  She was staying down here.  It got knocked
     off the counter, the keys got knocked off of it,

                              -25-

the motherboard, the Apple guy said couldn't be
repaired, and I threw it away.  He said it would
cost more to fix it than it was worth, so we got a
new one.

Q.   Oh, it was the motherboard, I thought it was the
screen?

A.   No, sir, I don't believe I have ever said that the
screen was broken, it was the motherboard, and we
even – he even tried some fancy thing to try to get
the information off the disk drive, he said it
wasn't worth keeping, and so we threw it away that
week when the trash comes on Thursday.

Q.   All right.  I'm going to put up pages 303 and 304
of your deposition, line 21 on page 303. . . .
[Carr reads deposition questions and answers
relating to damaged laptop computer]. . . .  Did
you say that?

A.   Yes, sir, I said the screen, but if you would have
looked at the computer, it got dropped on the back
left corner right where the power cord goes into
the computer.  At the Apple store, they couldn't
get the screen to come up.  The – they couldn't get
the thing to do anything but stay black, and they
tried plugging a cable in it to get the information
off of it.  It had two or three keys broken off of
it.  So when I'm referring to screen, they just
couldn't get the thing to start up.

Q.   But a motherboard is what is inside the computer,
the screen is obviously the screen like that,
right?

A.   Yeah, but they couldn't get any image or anything
on the screen.

Q.   So sitting here now, are you telling me it was the
screen or are you telling me it was the
motherboard, or do you know?

A.   I handed it to the guy at the Apple store, I said,
hey, this computer is two or three years old, and
he said it's not worth fixing.

Q.   Well, I mean you can tell if the glass is broken or

-26-

cracked or whatever on the screen.

A.    Right, but we weren't getting any light behind the
      screen.

. . . .

Q.    Let me see if I can ask you this question.  With
      respect to China Gilco document, would you agree
      that in its form, as it sits in front of you and as
      it was sent to Scott England on February 9, 2006,
      it would not be suitable for print in a trade
      publication as –

A.    I would agree with that.

Q.    You would agree?

A.    Uh-huh.

Q.    And you had said in your affidavit this e-mail was
      planned to be the kickoff article in the Hardwood
      Report Newsletter if I had followed through with
      starting the newsletter company, right?

A.    Correct.

Q.    In your affidavit, you didn't talk about doing any
      editing of the e-mail or the attachment, you didn't
      talk about taking Gilco Lumber out of the document
      or changing it in any way, you talked about the
      document China Gilco being the article, but now you
      say it wouldn't be suitable?

A.    Mr. Carr, I wouldn't put a newsletter that I had
      planned to circulate to 15 or 20,000 people with
      those specific references in it.  You're getting
      down to a level of specificity here that I was –
      no, I didn't say that in my affidavit.

. . . .

Q.    The first thing that I wanted to talk to you about
      was with respect to the e-mail that we had been
      discussing at some length yesterday, the February
      '09 – excuse me, February 9, '06 email that you
      sent to Mr. England with the attached document,
      China Gilco.  Did that e-mail reside on the

computer that you used at Shannon?

A.   No, sir.

Q.   You used a computer which I believe you said was
     your personal computer while you worked at Shannon?

A.   Yes, sir, I did.

Q.   And you don't have that computer anymore because
     you discarded it?

A.   Yes, sir.

Q.   And you intentionally got rid of that computer?

A.   We were preparing our house to put it on the
     market, and there was a young kid that was with one
     of the workers and he needed a laptop, it was five
     years old, I hadn't even turned it on. . . .

Q.   Okay.  And you gave that computer away after you
     had wiped the disk drive?

A.   Yes, sir.

Q.   And you gave that computer away to a child whose
     name you don't remember?

A.   It was a young child of one of the workers.  Yes, I
     don't remember his name.

(8/19/10 Barrett Tr. at 49-54, 59-63, 73-85; 8/20/10 Barrett Tr. at
106-07.)

**F.   The Jury's Verdict**

Consistent with its order on the parties' cross-motions for
summary judgment, the court instructed the jury that it could
consider the China Gilco Document in deciding whether Barrett
misappropriated Shannon Lumber's trade secrets in violation of the
TUTSA, but that it could not consider the document in deciding

whether Barrett breached his fiduciary duties owed to Shannon
Lumber. (See Jury Instructions, D.E. 348 at 31, 65.) The court
granted Shannon Lumber's request to give an adverse inference
instruction to the jury regarding the laptop computers.[6] However,
the court denied Shannon Lumber's request to include special jury
questions (Amended Proposed Jury Verdict Form Questions Nos. 13 and
14.) regarding whether the jury believed Barrett testified
truthfully at his deposition and whether he was truthful in his
affidavit about the China Gilco Document.

At the conclusion of the trial, Shannon Lumber sought
$28,000,000 in damages. On August 26, 2010, the jury returned a
verdict in favor of Barrett on Shannon Lumber's claims for trade
secret misappropriation, breach of the Non-Solicitation provision,
tortious interference with contract, unfair competition, and

---

[6]The instruction provided as follows:

> You have heard evidence that two computers used by Mr.
> Barrett were lost and that those computers may have
> contained evidence that is at issue in this case.
>
> If a party fails to produce evidence that is under his
> control and reasonably available to that party and not
> reasonably available to the adverse party, then you may
> infer that the evidence is unfavorable to the party who
> could have produced it and did not. On the other hand,
> sometimes evidence is lost or destroyed for an innocent
> reason or a reason out of the control of a party. In
> such circumstances, the loss or destruction of the
> evidence should not lead to an inference that is
> unfavorable to that party.

(D.E. 348 at 21.)

punitive damages.  The jury found in favor of Shannon Lumber on its claim for breach of common law fiduciary duty and duty of loyalty, and awarded $70,000 in damages.  The jury also found in favor of Shannon Lumber on its claims for breach of the Confidentiality and Non-Competition provisions, but awarded no damages for those claims.

**G.   Post-Trial Pursuit of Motion for Sanctions**

On September 28, 2010, Shannon Lumber filed a Supplemental Memorandum in Support of its Motion for Sanctions.  In addition to reiterating some of the arguments made in its original Motion for Sanctions, Shannon Lumber argues in its Supplemental Memorandum that Barrett continued his pattern of providing "perjured testimony" by testifying falsely at trial about the China Gilco Document and his laptop computers.  In addition, Shannon Lumber states that on July 22, 2010, one of Barrett's attorneys was sent a letter alleging Rule 11 violations in an unrelated case pending in Shelby County Chancery Court, and that this letter "shows that counsel has engaged in similar behavior in both cases, namely pursuing claims and seeking substantial damages from them without a factual basis to do so." (Pla.'s Supp. Mem. in Support of Mot. for Sanctions, D.E. 377 at 12.)  Shannon Lumber also contends that Barrett's counsel improperly attempted to serve non-party Frank Owens during his deposition in the Mississippi litigation with a subpoena and notice to take deposition, prompting Owens to file a

-30-

motion to quash.[7]  Shannon Lumber states that "Barrett's counsel's conduct in serving Mr. Owens, an immune witness, during his deposition is another example of the vexatious way in which Mr. Barrett and his counsel have intentionally harassed [J.T.] Shannon, attempted to win every litigation battle at any cost without regard for the Rules and unnecessarily increased the attorney fees and costs of this litigation." (<u>Id.</u> at 14.)

## II.   PROPOSED CONCLUSIONS OF LAW

### A.   Rule 11

"Rule 11 generally requires an attorney to conduct a reasonable inquiry into the relevant law and facts before signing pleadings, written motions, or other documents, and it prescribes sanctions for violations of these obligations." <u>Nieves v. City of Cleveland</u>, 153 F. App'x 349, 352 (6th Cir. 2005); <u>see also</u> <u>Jones v. Illinois Central Railroad Co.</u>, 617 F.3d 843, 854 (6th Cir. 2010) (stating that Rule 11 authorizes a court to sanction an attorney who presents court filings for an improper purpose or based on frivolous arguments).  The rule provides:

> **(b) Representations to the Court.** By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge,

---

[7]On December 31, 2009, Chief Judge McCalla held a telephonic hearing on the motion.  At the conclusion of the hearing, he found that the service of the subpoena was improper, but he denied the motion to quash on equitable grounds and allowed Barrett to proceed with taking Owens's deposition.  (D.E. 386-1 at 34-36.)

information, and belief, formed after an inquiry
reasonable under the circumstances:

    (1)  it is not being presented for any improper
        purpose, such as to harass, cause unnecessary
        delay, or needlessly increase the cost of
        litigation;

    (2)  the claims, defenses, and other legal
        contentions are warranted by existing law or
        by a nonfrivolous argument for extending,
        modifying, or reversing existing law or for
        establishing new law;

    (3)  the factual contentions have evidentiary
        support or, if specifically so identified,
        will likely have evidentiary support after a
        reasonable opportunity for further
        investigation or discovery; and

    (4)  the denials of factual contentions are
        warranted on the evidence or, if specifically
        so identified, are reasonably based on belief
        or a lack of information.

Id.

In the Sixth Circuit, the test for the imposition of Rule 11 sanctions is "whether the attorney's conduct was objectively reasonable under the circumstances," and the trial court "has broad discretion in determining when a sanction is warranted and what sanction is appropriate."[8]  Nieves, 153 F. App'x at 352; see also Huntsman v. Perry Local Schools Bd. of Educ., 379 F. App'x 456, 461 (6th Cir. 2010) (same).  "The court is expected to avoid using the

---

[8]Rule 11 requires the party seeking sanctions to provide "safe harbor" notice by serving the motion on the opposing party at least twenty-one days before filing the motion with the court.  Fed. R. Civ. P. 11(c)(2).  Shannon Lumber states in its motion that Barrett and the Kiesewetter firm were served with the motion in compliance with the safe harbor notice requirement.

wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." Merritt v. International Ass'n of Machinists and Aerospace Workers, 613 F.3d 609, 626 (6th Cir. 2010) (internal quotation marks and citation omitted).

Shannon Lumber argues that the court should sanction the Kiesewetter firm under Rule 11 because the firm (1) was on notice after Barrett's deposition that he had lied about the China Gilco Document and therefore all motions and other papers filed by the Kiesewetter firm after his deposition were presented for an improper purpose and without evidentiary support; (2) refused to amend Barrett's answer, in which Barrett maintained that he did not breach his Employment Agreement; and (3) continued to pursue a frivolous defense and counterclaim based on alleged illegal activities by Shannon Lumber.

With respect to the first argument, the court finds that the Kiesewetter firm acted reasonably under the circumstances in filing Barrett's Motion for Summary Judgment and other papers after Barrett was deposed. Although Shannon Lumber may reasonably believe that Barrett was not being truthful when he testified at his deposition about the China Gilco Document, and that his affidavit and trial testimony also were not credible, it was equally reasonable for the attorneys of the Kiesewetter firm to believe their client and rely upon his explanation for the China

-33-

Gilco Document in filing papers with the court.  Barrett signed an affidavit under penalty of perjury that explained that he had considerable experience with being an editor for newsletters in the lumber industry, that Barrett notified Mr. Shannon of his newsletter business plan and even provided Mr. Shannon with a newsletter plan, and that the document was created and sent to England with the hope that Barrett could get England and Harless to financially support his newsletter.  While Barrett testified at trial that the China Gilco Document was going to be used as two articles (a fact which was not mentioned in his affidavit), the substance of his testimony at trial was materially consistent with his affidavit.  Moreover, England's deposition testimony provided some corroboration for Barrett's contention that he wanted England to invest in his newsletter.  Barrett's credibility was extensively challenged at trial, and the jury was in the best position to assess his credibility and make liability determinations based on its credibility assessments.  Although it is unclear whether the jury believed Barrett's testimony regarding the document, the ultimate focus of the Rule 11 inquiry is not on the jury's opinion of Barrett's credibility, but rather on whether the Kiesewetter firm acted reasonably under the circumstances.[9]

---

[9]The court instructed the jury to consider the China Gilco Document in deciding only the TUTSA claim and that it could not consider the document in deciding the breach of fiduciary duty claim.  Barrett and the Kiesewetter firm contend the fact that the jury returned a verdict in favor of Shannon Lumber on the breach of fiduciary duty

As for whether the firm acted reasonably in continuing to maintain that Barrett did not breach his Employment Agreement, Chief Judge McCalla denied Shannon Lumber's Motion for Summary Judgment on this claim, and while the jury found that Barrett breached the Confidentiality and Non-Competition provisions of his Employment Agreement, it awarded no damages on this claim. Thus, the defenses raised by the Kiesewetter firm on the breach of contract claim were nonfrivolous and therefore the firm acted reasonably in defending against this claim. Regarding the firm's decision to raise a defense and bring a counterclaim based on Shannon Lumber's alleged illegal activities, these issues were severed prior to trial and were not presented to the jury for determination. Shannon Lumber never filed a dispositive motion on this counterclaim, and as a result the merits of the counterclaim were never fully presented to the court for adjudication. Barrett has cited to evidence in the record that support his defense and counterclaim, including, among other things, his own deposition

---

claim and against it on the TUTSA claim, coupled with its decision to not award any punitive damages, demonstrates that the jury must have found Barrett's testimony as to the China Gilco Document to be credible. While this may be true, it is also possible that the jury could have found Barrett to be not credible, but ultimately found in favor of Barrett on the TUTSA claim because Shannon Lumber failed to prove an essential element of that claim (e.g. that the information contained in the document qualified as a trade secret). In any event, as discussed above, the jury's assessment of Barrett's credibility would not be dispositive of the issue that this court must decide – whether the Kiesewetter firm acted reasonably.

testimony and the deposition testimony of Steven Helffrich (the former general manager of Shannon Lumber's Shamrock Wood Industries Division).[10]   Based on this record, the court finds that the Kiesewetter firm acted reasonably in raising this defense and counterclaim.

**B.    28 U.S.C. § 1927**

When a party engages in "vexatious litigation," the court may impose sanctions on that party.  <u>See</u> 28 U.S.C. § 1927.  Pursuant to this statute, an attorney "who so multiplies the proceedings in any case unreasonably or vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  <u>Id.</u>  The Sixth Circuit has determined that sanctions under § 1927 are appropriate "when an attorney has engaged in some sort of conduct that, from an objective standpoint, 'falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party.'"  <u>Wilson-Simmons v. Lake County Sheriff's Dept.</u>, 207 F.3d 818, 824 (6th Cir. 2000) (quoting <u>Holmes v. City of Massillon, Ohio</u>, 78 F.3d 1041, 1049 (6th Cir. 1996)).  A court may award sanctions for unreasonable and vexatious litigation even in the absence of "conscious impropriety."  <u>Hall v.</u>

---

[10]Shannon Lumber filed a motion in limine to exclude evidence relating to the alleged illegal activities.  Barrett filed a response in opposition to this motion, citing evidence in the record that supports this defense and counterclaim.  It is unclear from the record how the motion was resolved.

<u>Liberty Life Assur. Co. of Boston</u>, 595 F.3d 270, 275 (6th Cir. 2010) (citation omitted).  The proper inquiry does not turn on whether an attorney acted in bad faith; rather, the court must determine whether "an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of nonfrivolous claims." <u>Id.</u> (quoting <u>Ridder v. City of Springfield</u>, 109 F.3d 288, 298 (6th Cir. 1997)).

For the same reasons discussed above in the Rule 11 analysis, the court finds that sanctions under § 1927 are not warranted. Moreover, with respect to Shannon Lumber's claim that Barrett spoliated evidence by discarding his two laptop computers, Barrett testified that he had given one computer away and the other had been damaged by his wife, and there was no evidence to contradict this testimony.  Barrett's testimony on this issue was challenged at trial, and the jury had the opportunity to assess the credibility of this testimony and was even given an adverse inference instruction on the missing computers.  Regarding Shannon Lumber's allegation that Barrett and the Kiesewetter firm needlessly increased Shannon Lumber's litigation expenses by propounding voluminous and irrelevant discovery requests, the various magistrate judges assigned to this case authorized Barrett to obtain many of the documents sought in discovery, and while Chief Judge McCalla at the January 5 hearing narrowed the scope of

-37-

the discovery requests, he nevertheless permitted Barrett to pursue discovery on many of the topics.  As for the Frank Owens subpoena, the same issues raised in the present motion were previously addressed by Chief Judge McCalla at the December 31 hearing, where he found that service was improper but ultimately denied the motion to quash and allowed Barrett to proceed with the deposition. Finally, the court finds that the Rule 11 letter that one of the attorneys for the Kiesewetter firm received from opposing counsel in another case has absolutely no relevance to the conduct of counsel in the present case.  The letter was sent to the attorney in an unrelated case, he responded with a letter setting forth in great detail the legal and factual bases for the claims, and a Rule 11 motion was never filed in that case.

### III.   RECOMMENDATION

For the reasons above, the court recommends that Shannon Lumber's Motion for Sanctions be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

February 9, 2011
Date

### NOTICE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(c).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND**

ANY FURTHER APPEAL.